**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jill Ann Mons,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>Michael J. Astrue, Commissioner of Social Security,<br><br>　　　　Defendant. | No. CV-09-01687-PHX-NVW<br><br>**ORDER** |

Plaintiff Jill Ann Mons seeks review, pursuant to 42 U.S.C. § 405(g), of the administrative denial of her application for social security disability insurance benefits and supplemental security income. Because the ALJ's decision was based on legal error, the Commissioner's decision will be vacated and remanded for further administrative proceedings.

**I.   Background**

　　**A.   Factual Evidence**

Ms. Mons was born August 19, 1970. (Tr. 132.) She graduated high school and has a bachelor's degree in social work from Northern Arizona University. (Tr. 36, 38.) Her work history includes positions as a receptionist, waitress/hostess, and case aide to a non-profit organization. (Tr. 200.) Ms. Mons suffers from bipolar disorder, depression, panic disorder, and alcohol and marijuana dependence. She has been prescribed

1  Depakote, a mood stabilizer, and Effexor, an anti-depressant, to treat her condition. (Tr.
2  142.) Ms. Mons claims that the effects of her anxiety attacks, bipolar disorder and
3  depression leave her unable to handle the stress of a job or concentrate on her job duties.
4  (Tr. 137.)  It is undisputed that Ms. Mons has not engaged in significant gainful
5  employment since May 15, 2005, when she left her job as a waitress.  (Tr. 37.)  Ms. Mons
6  stated that she lived alone, and that her daily activities consisted of cleaning her home,
7  preparing simple meals, doing laundry, watering plants, shopping for groceries, watching
8  television, attending church, walking to doctor's appointments, and spending time with
9  her family. (Tr. 44-46, 190-195.)
10       Prior to her alleged disability onset date of May 15, 2005, Ms. Mons was
11 hospitalized four times and sought treatment variously for paranoid delusions and
12 hallucinations (Tr. 356, 358), manic episodes with psychosis (Tr. 344-55), anxiety and
13 depression related to bipolar disorder and alcohol dependence (Tr. 441-49), and substance
14 abuse of alcohol and marijuana.  (Tr. 300-320.)  After her alleged disability onset date,
15 Ms. Mons sought treatment at Helping Associates in June 2005 for her bipolar disorder;
16 she continued to receive ongoing counseling there through 2006 and 2007.  (Tr. 370.)  On
17 September 20, 2007, Ms. Mons was hospitalized for fourteen days and treated for a manic
18 episode.  (Tr. 540-50.)  Upon her release on October 8, 2007, Ms. Mons was admitted to a
19 treatment center, Southwest Behavioral Health Services (Tr. 621), from which she
20 voluntarily discharged herself on October 20, 2007. (Tr. 630.)  Ms. Mons continued
21 receiving counseling at Helping Associates for the remainder of 2007, 2008, and into
22 2009.  (Tr. 678.)
23       **B.     Procedural History**
24       On December 15, 2006, Ms. Mons filed a Title II application for disability
25 insurance benefits and a Title XVI application for supplemental security income.  Ms.
26 Mons alleged disability from bipolar disorder, panic disorder, and alcohol and marijuana
27 dependence in early remission, with an onset date of May 15, 2005.  Ms. Mons is insured
28 through December 31, 2010, and must establish disability on or before that date to be

- 2 -

entitled to benefits.

The SSA denied Ms. Mons's application initially on April 18, 2007, and again upon reconsideration on August 22, 2007. Ms. Mons had a hearing before an ALJ on April 16, 2008, which was attended by Ms. Mons, her attorney Eric Slepian, and vocational expert Ruth Van Fleet. The ALJ issued an unfavorable decision on June 17, 2008. Ms. Mons filed a request for review of the ALJ's decision on August 15, 2008. On June 15, 2009, the SSA Appeals Council denied her request and the ALJ's decision became the final decision of the Social Security Commissioner. Pursuant to 42 U.S.C. §405(g), Ms. Mons sought judicial review of the ALJ's decision in this Court on August 14, 2009.

## II.     Standard of Review

The Court will uphold the Commissioner's final decision if it is supported by substantial evidence and not based on legal error. *See* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive"); *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). The substantial evidence standard requires the evidence to "be more than a mere scintilla but not necessarily a preponderance." *Tomassetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations omitted). The Court must consider the "entire record as a whole and may not affirm simply by isolating a 'specific quantum of supporting evidence.'" *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (citations omitted).

The Court will also review only the issues raised by the party challenging the ALJ's decision. *See Lewis v. Apfel*, 235 F.3d 503, 517 n.13 (9th Cir. 2001). The ALJ's decision will be upheld where the "evidence is susceptible to more than one rational interpretation" and the ALJ's decision is supported by one such rational interpretation. *Orn*, 495 F.3d at 630. The court will not reverse for harmless error, which exists "when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tomassetti*, 533 F.3d at 1038.

## III.    Analysis

Social Security regulations define disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To determine whether a claimant is disabled, the ALJ conducts a five-step analysis as outlined in 20 C.F.R § 404.1520(a)(4).

At step one, the ALJ found that Ms. Mons was not engaged in substantial gainful activity. (Tr. 22.) At step two, the ALJ found that Ms. Mons had the following severe impairments: bipolar disorder, panic disorder, and alcohol and marijuana dependence in early remission (not material). (*Id.*) At step three, the ALJ found that Ms. Mons did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). Ms. Mons does not allege error with respect to the ALJ's findings in steps one, two and three.

At the fourth step, the ALJ assessed Ms. Mons's residual functional capacity and her ability to perform past relevant work. The ALJ found that while Ms. Mons was unable to perform any past relevant work (Tr. 28), she was able to perform a full range of work at all exertional levels, and short and simple tasks. He found she had moderate mental limitations in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerance, interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. (Tr. 24.) At the fifth step, the ALJ considered Ms. Mons's age, education, work experience, and residual functional capacity; he found that she was not disabled as there were significant numbers of jobs in the national economy that she could perform, such as janitor, assembler, and car washer. (Tr. 28.) Ms. Mons alleges error in the ALJ's determination of her credibility, consideration of Carol Mons's third party report, failure to ask the testifying vocational expert about conflicts between her testimony and the Dictionary of Occupational Titles, and weighing of the medical opinion evidence.

### A.     The ALJ Properly Evaluated Ms. Mons's Credibility.

The ALJ engages in a two-step analysis when evaluating a claimant's testimony as to subjective pain or other symptoms. *See Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The ALJ must first determine that "the claimant has presented objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged" and that the claimant is not malingering. *Id.* If the ALJ finds the claimant's testimony is not credible, he must provide specific, clear and convincing reasons for so finding. *Id.* Further, if the ALJ's "credibility finding is supported by substantial evidence in the record, [the reviewing court] may not engage in second-guessing." *Thomas v. Barnhart*, 278 F.3d 947, 958-59 (9th Cir. 2002).

When evaluating the intensity and persistence of a claimant's symptoms, the ALJ considers a broad range of factors in addition to the claimant's own statements regarding the limitations caused by her symptoms. These factors include the claimant's daily activities, effectiveness of any medication or treatment in controlling the symptoms, objective medical evidence of the symptoms, and statements by treating and non-treating sources about how a claimant's symptoms affect her ability to work. *See* 20 C.F. R. §404.1529(c). With respect to daily activities, a claimant is not required to be "utterly incapacitated" to be found disabled. *See Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989). However, if a claimant is

> able to perform household chores and other activities that involve many of the same physical tasks as a particular type of job, it would not be farfetched for an ALJ to conclude that [a claimant's] pain does not prevent [the claimant] from working...a specific finding as to this fact may be sufficient to discredit an allegation of disabling excess pain. (*Id.*)

Further, "[w]hile subjective pain testimony cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence, the medical evidence is still a relevant factor in determining the severity of the claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001).

#### 1.     Ms. Mons's hearing testimony

At the hearing, Ms. Mons stated that she left her most recent job because she was

- 5 -

1  "stressed out," was "lashing out at [her] customers and [her coworkers]," and "wasn't
2  getting along with most of the people [she] worked with." (Tr. 37.) She reported that her
3  manic episodes interfered with her previous receptionist job and ultimately caused her
4  dismissal from that position. (*Id.*) Ms. Mons stated that she could not work because she
5  was having problems with her hygiene, was depressed, and needed to take naps most
6  days. (Tr. 44.) She claimed to have the following symptoms of depression: negativity,
7  being overwhelmed, irritability, weight gain, sleeping, isolation, and difficulty with
8  memory and concentration. (Tr. 50-51.) She described her representative daily activities
9  as getting up, having coffee and cigarettes, walking to doctor's appointments, spending
10 time with her parents, napping, eating, watching television, going grocery shopping, and
11 doing laundry. (Tr. 44-45.) Ms. Mons noted that there have been times when she
12 neglects chores and does not leave the house. (Tr. 51.) She also detailed her history of
13 marijuana and alcohol use and dependence. (Tr. 37-44.)

### 2. The ALJ's credibility findings

15      The ALJ considered the evidence and found that while Ms. Mons had produced
16 objective medical evidence of an impairment which could reasonably produce her alleged
17 symptoms, her "statements concerning the intensity, persistence and limiting effects of
18 [her] symptoms are not credible to the extent they are inconsistent with the residual
19 functional capacity assessment for the reasons explained below." (Tr. 25.) The ALJ went
20 on to give specific reasons based on the evidence in record for discounting Ms. Mons's
21 credibility. First, he found that Ms. Mons's statements were inconsistent with much of
22 the objective medical evidence presented. The ALJ credited progress notes from Ms.
23 Mons's treatment at Helping Associates indicating that she had been "compliant with
24 medication and appeared stable over a significant period of time." (*Id.*) The ALJ noted
25 that after her discharge from Southwest Behavioral Health Services for voluntary alcohol
26 detoxification, Ms. Mons "continued on psychiatric medications as prescribed" and was
27 "free of withdrawal symptoms and alert and oriented...with good grooming and
28 hygiene...[h]er insight and judgment were intact." (*Id.*) The ALJ also credited

1  psychiatric progress notes throughout 2006 which reported Ms. Mons's mood and
2  symptoms as "stable," "doing well," "decreased anxiety," "no symptoms of psychosis,"
3  unremarkable appearance, good hygiene, eye contact, insight judgment, concentration,
4  affect, perception, and memory. (Tr. 25-26.)

5  The ALJ then considered objective medical evidence stemming from Ms. Mons's
6  consultative evaluation with psychologist Dr. Geary, in which Dr. Geary reported Ms.
7  Mons's "cognition was grossly intact," she was "independent in all activities," she
8  "appeared depressed although her mood seemed stable[,] and there was no evidence of
9  mood swings or acute bipolar symptoms." (Tr. 26.) Dr. Geary also found that Ms. Mons
10 was moderately limited in certain areas, including her capacity to "carry out detailed and
11 complex job instructions, maintain regular attendance, complete a normal work week
12 without interruption from psychological symptoms, persistently deal with the public, and
13 adhere to basic standards of neatness and cleanliness." (*Id.*) Although Ms. Mons had
14 reported some stress, anxiety, and specific phobias, Dr. Geary believed Ms. Mons's
15 symptoms would improve if she refrained from using drugs and alcohol. (*Id.*)

16 Further, the ALJ noted that Ms. Mons's prognosis after inpatient treatment for
17 bipolar disorder and mania was "fair, [depending] on 'compliance with her current
18 treatment plan and social support.'" (Tr. 26.) He also noted that during her
19 hospitalization, Ms. Mons was "placed 'back on'" certain of her medications. (*Id.*)
20 Progress notes chronicling Ms. Mons's treatment through the end of 2007 and into 2008
21 stated Ms. Mons "had periods of sadness," but that her appearance, eye contact, and
22 cooperation were good, her speech normal, affect appropriate, and insight fair; she was
23 also oriented to person, place, time, and circumstances, compliant with medication, and
24 "appeared to be responsive and functioning within normal limits." (*Id.*) Nonetheless,
25 nurse practitioner Judy Johnson gave her opinion in a medical assessment that Ms. Mons
26 was disabled and had a restrictive mental residual functional capacity (*id.*), and therapist
27 Denise Carr gave the opinion that Ms. Mons was disabled by her bipolar disorder and had
28 restrictive mental limitations. (Tr. 26.) The ALJ stated that he did not give controlling

1  weight to either Ms. Johnson or Ms. Carr's conclusions as they were inconsistent with the
2  progress notes and because neither Ms. Johnson nor Ms. Carr was a qualified
3  psychologist or psychiatrist. (Tr. 26-27.)

4  After considering the objective medical evidence, the ALJ went on to weigh other
5  factors in his credibility determination. He noted that Ms. Mons had "acknowledged
6  longstanding difficulties with alcohol and marijuana...[and] acknowledged alcohol use the
7  week prior to the hearing, and in or around December 2007." (Tr. 27.) The ALJ also
8  noted that he found Ms. Mons to be "circumspect about her drinking and the use of
9  marijuana." (*Id.*) The ALJ also credited evidence that treatment was generally successful
10 in controlling Ms. Mons's symptoms, weighing against the credibility of her testimony
11 regarding the "severity and functional consequences of her symptoms." (*Id.*) Finally, the
12 ALJ factored in evidence regarding Ms. Mons's functioning in her daily activities in his
13 credibility assessment and found that Ms. Mons's "self-described daily activities are not
14 that limited to the extent one would expect, given the complaints of disabling symptoms
15 and limitations." (*Id.*)

16 The ALJ thus did not rely solely on the fact that Ms. Mons's reported daily
17 activities were inconsistent with her disability, nor did he justify his credibility
18 determination on the lack of full and objective medical corroboration for Ms. Mons's
19 symptoms alone. Rather, his determination was based on an overall assessment of several
20 factors collectively. *See Thomas*, 278 F.3d at 958-59 (noting ALJ may consider several
21 different factors when weighing claimant's credibility). Because the ALJ provided
22 specific, clear, and convincing reasons for discounting Ms. Mons's statements regarding
23 the severity and impact of her symptoms, including objective medical reports, the extent
24 of and independence in daily activities, her drug and alcohol use and circumspection at
25 the hearing with regard thereto, and the effectiveness of treatment in controlling her
26 symptoms, there was no error in the ALJ's credibility determination.

27     **B.**    **The ALJ Properly Weighed Carol Mons's Third Party Report.**
28 On January 24, 2007, Carol Mons, Ms. Mons's mother, completed a third party

- 8 -

function report detailing her observations regarding her daughter's daily life activities and the limiting impact of Ms. Mons's impairment. (Tr. 180-87.) Ms. Mons alleges that the ALJ erred by rejecting, without reason, Carol Mons's third party report. Under 20 C.F.R § 404.1513(e)(2), "observations by nonmedical sources about how impairments affect a claimant's ability to work" will be considered in assessing a disability claim. *See Smolen*, 80 F.3d at 1288. Friends and family "in a position to observe a claimant's symptoms and daily activities are competent to testify as to [the claimant's] condition." *Dodrill v. Shalala*, 12 F.3d 915, 918-19 (9th Cir. 1993). An ALJ must "give reasons that are germane to each witness" in order to discount the testimony of a lay witness. *Id.* at 919.

Contrary to Ms. Mons's allegations, the ALJ did not reject Carol Mons's report or improperly discount her testimony. Rather, the ALJ discussed Carol Mons's report and noted several of her observations made therein: that her daughter usually spent one day a week at her home, shopped, went to church on a regular basis, watched television, prepared simple meals, did light household chores and laundry, went out daily, used public transportation, drove a car, walked, rode a bicycle, and handled her finances. (Tr. 25.) Further, the ALJ noted Carol Mons's statements in the report that her daughter spent time with others, had no difficulty getting along with others, took notes for reminders, was able to follow instructions, but did not do well with changes in routine or stress. (*Id.*) Rather than finding that the ALJ implicitly rejected Carol Mons's report by denying Ms. Mons's disability claim, it can be inferred that the ALJ credited her report by finding that Ms. Mons's "medically determinable impairments could reasonably be expected to produce the alleged symptoms" (*id.*) and that Ms. Mons's daily activities belied a claim of severe functional impairment. (Tr. 27.)

The ALJ went on to find that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment...." (*Id.*) The testimony rejected here by the ALJ concerned statements made by Ms. Mons herself regarding the severity of her symptoms; the ALJ does not reject Carol Mons's testimony. The

1  statements made by Carol Mons were consistent with the ALJ's findings that while Ms.
2  Mons's impairment caused anxiety and stress that limited her in some ways, she was still
3  able to complete many daily life activities.
4        Even if it could be inferred that the ALJ discounted portions of Carol Mons's
5  report regarding the intensity of Ms. Mons's symptoms, the ALJ gave sufficient reasons
6  for disbelieving the purported intensity of Ms. Mons's limitations.  The ALJ explained
7  that he found the claim that Ms. Mons could not engage in any substantial gainful activity
8  as a result of her bipolar disorder and panic disorder lacking credibility, given the extent
9  to which she could carry on daily life activities.  (Tr. 27.)  This statement is a sufficiently
10 germane reason to discount Carol Mons's report as well, since her report detailed the
11 extent of her daughter's daily activities.  *See Lewis*, 236 F.3d at 512 (finding ALJ's
12 observation that claimant's daily activities were inconsistent with family reports
13 regarding severity of claimant's symptoms sufficiently germane to reject family testimony
14 even though ALJ "did not clearly link his determination to those reasons").  The ALJ thus
15 properly weighed Carol Mons's third party report.

16/17  **C.  The ALJ's Failure to Ask Testifying Vocational Expert, Ms. Ruth Van Fleet, Whether Her Testimony Conflicted with the Dictionary of Occupational Titles was Harmless Error Since There Was No Conflict.**

18       Ms. Mons alleges that the ALJ failed to identify and resolve conflicts between the
19 Dictionary of Occupational Titles ("DOT") and the occupational evidence provided by
20 Ms. Ruth Van Fleet.  Under SSR 00-4p, an ALJ may not "rely on the testimony of a
21 vocational expert regarding the requirements of a particular job without first inquiring
22 whether the expert's testimony conflicts with the [DOT]."  *Massachi v. Astrue*, 486 F.3d
23 1149 (9th Cir. 2007).  However, failing to inquire whether a vocational expert's testimony
24 conflicted with the DOT is merely harmless error if there was no actual conflict.  *Id.* at
25 1154, n.19.
26       At Ms. Mons's hearing, the ALJ asked Ms. Van Fleet to assume an individual of
27 Ms. Mons's age, education, and work background, and assume that this individual was
28

- 10 -

1  moderately limited in four mental health categories.[1] (Tr. 52.) Ms. Van Fleet testified
2  that an individual so limited would not be able to perform Ms. Mons's past work.
3  However, she noted that there existed jobs in the national economy which such an
4  individual could perform, such as "janitor," "something in production assembly," and
5  "car vehicle washer." (Tr. 53-54.) Ms. Van Fleet provided the DOT numbers for these
6  three positions upon Ms. Mons's attorney's request, but the ALJ did not ask Ms. Van
7  Fleet whether her testimony conflicted with the DOT.

8       Ms. Mons has raised no conflict between Ms. Van Fleet's testimony and the DOT.
9  She does not identify any inconsistency between requirements for the positions Ms. Van
10 Fleet identified and the requirements for these positions listed in the DOT. Rather, Ms.
11 Mons's complaint here seems to be more accurately characterized as disputing the ALJ's
12 acceptance of some medical source opinions over others. Since there was no conflict
13 between Ms. Van Fleet's testimony and the DOT, the ALJ's failure to ask Ms. Van Fleet
14 whether her testimony was consistent with the DOT was inconsequential to his ultimate
15 determination that Ms. Mons was not disabled. Accordingly, this error was harmless.
16 *See Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006).

17      **D.**    **The ALJ Failed to Properly Weigh the Medical Opinion Evidence.**

18      Ms. Mons alleges that the ALJ did not properly weigh the various medical source
19 opinions in the record. When presented with conflicting medical opinions, the ALJ must
20 make credibility determinations and resolve any conflicts. *See Benton v. Barnhart*, 331
21 F.3d 1030, 1040 (9th Cir. 2003). Medical opinions in the record can be from "acceptable
22 medical sources," such as licensed physicians, licensed psychologists, or certified
23 psychologists, or "other sources," such as nurse practitioners or therapists. *See* 20 C.F.R.
24 §404.1513. The Ninth Circuit also distinguishes between treating physicians, examining

---

[1] The four categories of moderate limitation are ability to: carry out detailed instructions; perform activities with a schedule, maintain regular attendance and be punctual within customary tolerances; interact appropriately with the general public or to maintain socially appropriate behavior; and to adhere to basic standards of neatness and cleanliness. (Tr. 52).

- 11 -

1   physicians, and non-examining physicians. *See Lester v. Chater*, 81 F.3d 821, 830 (9th
2   Cir. 1995). Generally, the opinion of a treating physician is entitled to greater weight
3   than the opinion of a non-treating physician, and the opinion of an examining physician is
4   entitled to greater weight than the opinion of a non-examining physician. *Id.*

5   As explained in SSR 06-03p, "only 'acceptable medical sources' can be considered
6   treating sources...whose opinions may be entitled to controlling weight." 2006 WL
7   2329939, at *2. "Other sources" can give evidence of the severity of a claimant's
8   impairment and how her impairment affects her ability to function, *id.*, and their opinions
9   as to how an impairment affects a claimant's ability to work should be considered by an
10  ALJ as part of the record as a whole. *See Nguyen v. Chater*, 100 F.3d 1462, 1467 (9th
11  Cir. 1996). The weight given to the "other source" opinions should be evaluated using
12  factors such as the length, nature, and extent of the treatment relationship, the frequency
13  of examination, relevant evidence supporting the opinion, the consistency of the opinion
14  with the whole record, the source's medical specialization, and other factors. *See* SSR
15  03-06, at *4.

16  An ALJ is entitled to give more weight to the opinions of acceptable medical
17  sources than to the opinions of other sources. *See Gomez v. Chater*, 74 F.3d 967, 970-71
18  (9th Cir. 1996). However, an ALJ may also "give more weight to the opinion of a
19  medical source who is not an acceptable medical source if he or she has seen the
20  individual more often than the treating source and has provided better supporting
21  evidence and a better explanation for his or her opinion." SSR 03-06, at *5.
22  Accordingly, an ALJ must give specific, germane reasons, supported by the record, for
23  rejecting an "other source" opinion. *See Lewis*, 236 F.3d at 511.

24  **1.      Ms. Denice Carr and Ms. Judy Johnson**

25  Ms. Denice Carr is a therapist and an "other source" who treated Ms. Mons at
26  Helping Associates. The record contains her treatment progress notes and a medical
27  source statement she completed giving her opinion regarding Ms. Mons's ability to do
28  work-related activities. In her treatment progress notes, Ms. Carr repeatedly assessed Ms.

- 12 -

1  Mons as having fair insight, good appearance, eye contact, speech, cooperation, attention
2  and concentration, normal speech, appropriate mood and affect, and being oriented to
3  person, place, time, and circumstances.  (Tr. 584, 586, 594.)  On one occasion, she
4  assessed Ms. Mons's mood as sad and depressed, and her insight as poor (Tr. 596); her
5  impression and prognosis from that session noted that Ms. Mons "appeared responsive"
6  and continued "to be sad on an almost daily basis."  (*Id.*)  Ms. Carr noted during another
7  session that Ms. Mons "appeared responsive" and continued having "anxiety symptoms
8  as related to past events."  (Tr. 585.)  At other sessions, Ms. Carr stated her
9  "impression/prognosis" that Ms. Mons "appeared responsive and functioning" within
10 normal limits.  (Tr. 587, 595.)

11         In her medical source statement, Ms. Carr gave the opinion that Ms. Mons had
12 restrictive mental limitations in most categories and was disabled due to bipolar disorder.
13 She noted that Ms. Mons had poor coping skills, could be easily distracted, feared change,
14 and became nervous easily.  (Tr. 288-92.)  Although she assessed Ms. Mons as markedly
15 limited in many areas, Ms. Carr noted that when Ms. Mons was on medication, she could
16 remember short and simple instructions, maintain concentration, sustain an ordinary
17 routine, and have good social interactions.  (*Id.*)

18         Ms. Judy Johnson is a nurse practitioner and "other source" who completed a
19 medical assessment of Ms. Mons's ability to perform work related activities.  In her
20 assessment, Ms. Johnson noted her opinion that Ms. Mons was disabled and had a
21 restrictive mental residual functional capacity.  (Tr. 603-04.)  While her opinion may have
22 been based on ongoing treatment of Ms. Mons, in the assessment itself Ms. Johnson
23 simply circled the rating terms of Ms. Mons's functionality in various areas.  She did not
24 elaborate or provide more evidence as to how or why she reached these conclusions.  (*Id.*)

25         Contrary to Ms. Mons's complaint, the ALJ did state and consider the opinions of
26 Ms. Carr and Ms. Johnson in his decision.  (Tr. 26, 27.)  Ultimately, though, the ALJ
27 chose not to give these opinions controlling weight  because neither Ms. Carr nor Ms.
28 Johnson was a "qualified psychologist or psychiatrist" and their assessment opinions were

1  "not consistent with the progress notes" detailing Ms. Mons's condition.  (Tr. 26.)  The
2  ALJ cited substantial evidence in the record, including the inconsistency of Ms. Carr and
3  Ms. Johnson's assessments with Dr. Geary and Dr. Tangeman's assessments,  Ms. Carr's
4  progress notes, and Ms. Mons's daily activities, as well as Ms. Carr and Ms. Johnson's
5  "other source" status, for discounting their opinions.  These reasons are sufficiently
6  specific and germane to justify the ALJ's decision to not give controlling weight to Ms.
7  Carr and Ms. Johnson's opinions.  Although Ms. Carr and Ms. Johnson treated Ms. Mons
8  and had a longer relationship with her than either Dr. Geary or Dr. Tangeman, a rational
9  interpretation of the evidence as a whole supports the ALJ's ultimate determination to
10 accord controlling evidentiary weight to Dr. Geary and Dr. Tangeman's opinions.

### 2.     Dr. Brent Geary and Dr. Paul Tangeman

As a licensed psychologist, Dr. Brent Geary is an "acceptable medical source." Dr. Geary examined and evaluated Ms. Mons in March 2007, and submitted a detailed report explaining his medical opinions regarding Ms. Mons's residual functional capacity. (Tr. 455-65.)  He diagnosed Ms. Mons with bipolar I disorder, panic disorder, and alcohol and marijuana abuse in remission.  (Tr. 458.)  He explained the results of tests he administered to measure Ms. Mons's short-term recall, judgment, and ability to perform calculations.  (Tr. 456.)  Dr. Geary also stated his opinion that Ms. Mons was moderately limited in

> her capacity to carry out detailed and complex job instructions, maintain regular attendance, complete a normal work week without interruption from psychological symptoms, persistently deal with the public, and adhere to basic standards of neatness and cleanliness.  (Tr. 459.)

He noted that his prognosis was "guarded" but would likely "improve substantially" if Ms. Mons "maintain[ed] abstinence from alcohol and other drugs."  (*Id.*)  The ALJ gave Dr. Geary's opinion controlling weight, finding it to be "well supported by objective findings" and "not inconsistent with the other substantial evidence."  (Tr. 26.)

Dr. Paul Tangeman is a state agency psychologist who reviewed Ms. Mons's record and issued a mental residual functional capacity assessment did not treat or

- 14 -

1  examine her. (Tr. 467-84.) In his assessment, Dr. Tangeman found Ms. Mons was not
2  significantly limited in most areas; he also found that she was capable of performing short
3  and simple tasks. (Tr. 467-68.) Dr. Tangeman stated that Ms. Mons was moderately
4  limited in her ability to carry out detailed instructions, perform activities within a
5  schedule, maintain regular attendance, be punctual within customary tolerances, interact
6  appropriately with the general public, maintain socially appropriate behavior, and adhere
7  to basic standards of neatness and cleanliness. (*Id.*) He elaborated that Ms. Mons
8  displayed "adequate residual ability to sustain basic work tasks that are not fast paced or
9  socially demanding" and "appear[ed] stable over a significant period of time." (Tr. 469.)
10 He further noted that Ms. Mons appeared depressed and had some anxiety and specific
11 phobias, but "she was independent in all daily activities," and there was "no evidence of
12 mood swings or acute bipolar symptoms." (*Id.*) He also stated his opinion that the
13 medial source statement "provided by an unqualified psychological source is not
14 consistent with the progress notes." (*Id.*) The ALJ accorded evidentiary weight to Dr.
15 Tangeman's assessment because as the state agency reviewing physician he had
16 "expertise in the evaluation of medical issues in disability claims under the [Social
17 Security Act]." (Tr. 27.)

18 The ALJ's decision to assign controlling weight to Dr. Geary and Tangeman's
19 opinions was supported by substantial evidence in the record. The ALJ credited their
20 expertise and status as licensed psychologists and "acceptable medical sources" under the
21 regulations; he also found their opinions to be more consistent with the progress notes
22 regarding Ms. Mons's condition and the extent of her daily activities reported by both Ms.
23 Mons and her mother than the other medical source opinions. Accordingly, there was no
24 error in the ALJ's weighing of these medical opinions.

25                **3.**    **Dr. Marc Walter**

26 Dr. Marc Walter, a licensed psychologist and "acceptable medical source,"
27 evaluated Ms. Mons on April 22, 2008. (Tr. 653.) His assessment of Ms. Mons's ability
28 to perform work-related activities was submitted into evidence as a post-hearing

- 15 -

1  development. (Tr. 642.) Dr. Walter interviewed Ms. Mons and stated that in the
2  interview, Ms. Mons "describe[d] many psychotic symptoms as well as high levels of
3  depression, anxiety, paranoid ideation, emotional hypersensitivity, and physical problems
4  as well as obsessions." (Tr. 647.) Dr. Walter also administered an MMPI test, which
5  "generated an extremely elevated scale." (*Id.*) He noted that it was his "impression that
6  to some degree [Ms. Mons's] profile is a 'cry for help.'" (*Id.*) Dr. Walter diagnosed Ms.
7  Mons with bipolar I disorder, anxiety disorder, and probable obsessive compulsive
8  disorder, and found that she had periodic severe manic episodes in spite of her treatment.
9  He found she had "marked restriction" in activities of daily living, maintaining social
10 functioning, concentration, persistence, and pace, and that she had "repeated episodes of
11 decompensation, each of extended duration." (*Id.*)

12       The ALJ did not make any reference to Dr. Walter's opinion in his decision. Dr.
13 Walter's opinion constituted relevant medical evidence and should have been considered.
14 Failure to consider all of the relevant medical source opinion evidence is clear error. 20
15 C.F.R. §404.1527(d) ("Regardless of its source, we will evaluate every medical opinion
16 we receive."); *see also Smolen*, 80 F.3d at 1286 (finding error where ALJ's decision did
17 not discuss relevant medical source opinions). As consideration of additional medical
18 source opinion evidence could have impacted the ultimate disability determination, this
19 error is not harmless. *See Tomassetti*, 533 F.3d at 1038. Accordingly, the ALJ's decision
20 will be vacated and remanded for further proceedings.

21       Nothing in this order suggests that Dr. Walter's opinion need be credited as against
22 the extensive contrary evidence surveyed by the ALJ. However, it must be considered.
23 Indeed, it may have been considered already, but the silence of the record on whether it
24 was considered requires remand to assure that it is.

25
26
27
28 ////

1    IT IS ORDERED that the Clerk enter judgment vacating the final decision of the
2  Commissioner of Social Security and remanding this case to the Commissioner for further
3  proceedings as directed in this order.  The Clerk shall terminate this action.

4    DATED this 22nd day of October, 2010.

                                    Neil V. Wake
                                    United States District Judge